**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

---

ADVANTAGE CONSULTING GROUP, LTD. AND CARL BRAUN,

Plaintiffs,

v.

ADT SECURITY SERVICES, INC.,

Defendant.

Civil No. 00-424 (JRT/FLN)

**MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF ADVANTAGE CONSULTING GROUP'S MOTION FOR SUMMARY JUDGMENT**

---

Frederic W. Knaak, HOLSTAD & KNAAK, P.L.C., 1690 World Trade Center, 30 East 7th Street, St. Paul, MN, 55101, for plaintiffs.

Keith J. Broady, ABDO AND ABDO, P.A., 710 Northstar West, 625 Marquette Avenue, Minneapolis, MN, 55402, for defendant.

This case involves a recruiting contract between the parties in which plaintiff Advantage Consulting Group, Ltd. ("Advantage") agreed to fill a minimum of 187 job positions for defendant ADT Security, Inc. ("ADT"). ADT cancelled the contract after four months. Advantage brought suit to collect cancellation fees that it claims are due under the contract.[1] ADT brought a counterclaim arguing that it is entitled to a refund of fees that it paid to Advantage. ADT has also asserted a claim for indemnity against

[1] Carl Braun, the second plaintiff in this action, is the president and owner of Advantage. The parties have stipulated to the dismissal of Braun as a party [Docket No. 43].

FILED SEP 6 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD. SEP 6 2001
DEPUTY CLERK

Advantage for a conciliation court judgment it was forced to pay to an Advantage subcontractor. This matter is now before the Court on cross-motions for summary judgment. Because no genuine issues of material fact exist and interpretation of the contract is a matter of law for the Court, the Court grants plaintiff's motion for summary judgment and denies defendant's motion for summary judgment. Plaintiff is entitled to judgment in the amount of $95,250 for unpaid cancellation fees.

## BACKGROUND

On May 19, 1999, Advantage and ADT entered into a recruiting contract under which Advantage agreed to fill a minimum of 187 job positions for ADT in the Midwest during a six month period between June 1, 1999 and December 1, 1999. Advantage is an employee recruitment firm that provides staffing and recruitment services while ADT is a company that provides security services throughout the country.

The contract essentially required Advantage to provide ADT with a pool of qualified job applicants from which ADT could fill its hiring needs. The contract left ADT with the actual responsibility for hiring candidates, which included conducting interviews and extending offers. Advantage was responsible for advertising throughout the country for ADT's positions and for providing ADT with a qualified applicant pool.

For purposes of this lawsuit, there are three pertinent provisions of the parties' contract. Under the heading "Deliverables," the contract provided that:

> Advantage International will fill a minimum of 187 positions in the Midwest region for the contract rate between June 1, 1999 and December 1, 1999. If on September 1, 1999, AI is not on track to fill the required number of positions within the established timeframe, AI will assign

> additional staff to the project at no additional cost to ADT, to ensure timely completion.

Another portion of the contract set forth the compensation that Advantage would receive from ADT for its services. That provision stated:

> AI agrees to fill each position at a cost of $1750 per hire, for the Sales, Service Tech and Installer positions. All other positions are at a contract rate of $2500. There are 182 positions @1750 and 5@ $2500. The total investment for this project would then be $331,000. A retainer of $55,166 would be due and payable on June 1, 1999 and the remainder paid in 5 equal installments (monthly) of $55,166 beginning on July 1, 1999 and concluding on December 1, 1999.

In addition, the agreement included a clause addressing the consequences of canceling the contract. It explained that:

> ADT is contracting with AI to fill a minimum of 187 positions. Should ADT put the project on hold, cancel the remaining openings or for any reason decide to cancel the project other than for non-performance (documented), there will be a program cancellation fee of $750 for every remaining position unfilled.

The contract was signed by the parties in late May and Advantage began recruiting for the positions it had agreed to fill. By the middle of July, David Goldstein, ADT's Regional Vice President for the Midwest region, advised David Radcliffe, ADT's Director of Human Resources for the Midwest region, that ADT would have to stop spending money on Advantage unless it was filling ADT's hiring needs. Apparently, Goldstein did not know how many new employees had been hired as a result of

Advantage's work at that point. Goldstein's email was forwarded by Radcliffe to Carl Braun.[2]

By the end of August 1999, Radcliffe sent out another email indicating that more candidates needed to be hired quickly or Goldstein would put additional pressure on him to cancel the contract. On September 15, 1999, Advantage sent a letter to Radcliffe explaining that:

> We have approximately 2 ½ months left on the project and with the cooperation of all managers and GM's there is still time to make this a success. AI is highly motivated to make this project a success and will commit whatever resources are necessary to bring this project a positive result. However, it will take all managers interviewing and making offers to do this. We highly recommend all managers us[e] AI to its fullest by allowing our recruiters to set interview schedules and by making immediate offers to qualified candidates.

On September 29, 1999, Goldstein instructed Radcliffe to cancel the contract with Advantage. Goldstein claims that the reasons for canceling the contract were two-fold: he had received feedback from general managers and human resources personnel that ADT was not receiving qualified candidates; and ADT had only hired fifty to sixty employees through four months of the contract with Advantage.[3]

Radcliffe sent out an email canceling the contract effective September 30, 1999. After Radcliffe cancelled the contract, he told Braun that Advantage owed ADT a refund. Braun disagreed and sent a letter to Radcliffe on October 1, 1999, claiming that

---

[2] Braun and Radcliffe had a previous relationship when the two worked at a corporate headquarters together in the early 1990s.

[3] ADT also alleges that Advantage made some advertising mistakes in Indiana and Chicago, which justified its cancellation of the contract.

Advantage was entitled to a cancellation fee of $750 for each position that had not been filled. On October 7, 1999, ADT rejected Braun's demand, stating that it was not fully satisfied[4] with Advantage's performance and demanding a refund of $129,664 of the $220,664 that ADT had paid to Advantage.[5] The parties were unable to resolve their differences and Advantage then commenced this litigation.

## DISCUSSION

### I. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Id.*

[4] The contract included a clause stating: "Advantage International offers ADT it's exclusive 'Whatever It Takes No-Excuses' guarantee. This guarantee provides for TOTAL customer satisfaction."

[5] During the parties' relationship, ADT actually hired 60 candidates that were referred by ADT.

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *Vette Co. v. Aetna Casualty & Surety Co.,* 612 F.2d 1076 (8th Cir. 1980). However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, but it must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *Burst v. Adolph Coors Co.,* 650 F.2d 930, 932 (8th Cir. 1981).

**II. Contract Claims**

The primary claims in this case involve the interpretation of the payment and cancellation clauses in the parties' agreement. The construction of a written instrument is a question of law for the Court when the parties' intent can be determined from the writing. *Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 525 (Minn. 1990). When the language of a contract is clear and unambiguous there is no room for contract construction, *Colangelo v. Norwest Mortgage, Inc.*, 598 N.W.2d 15, 18 (Minn. Ct. App. 1999), and the Court must give the language its plain and ordinary meaning. *Litton Microwave Cooking Prods. v. Leviton Mfg. Co., Inc.*, 15 F.3d 790, 796 (8th Cir. 1994) (applying Minnesota law). A contract is ambiguous if it is susceptible to more than one

interpretation based on its language. *Metropolitan Sports Facilities Comm'n v. General Mills*, 470 N.W.2d 118, 123 (Minn. 1993).[6]

ADT argues that it has overpaid Advantage and is entitled under the contract to a refund as a matter of law. It is undisputed that ADT made the retainer payment and three monthly payments of $55,166 to Advantage, totaling $220,664, before canceling the contract. ADT concedes that Advantage is entitled to at least $105,000 for the positions that were filled (60 positions x $1750). It also maintains that if Advantage is entitled to any cancellation fee, that fee should be $95,250 (127 unfilled positions x $750). ADT therefore argues that it has overpaid Advantage by a minimum of $20,414 ($220,664 paid - $105,000 earned - $95,250 cancellation fee). ADT further argues that it was not "totally satisfied" by Advantage's performance and that it therefore appropriately terminated the contract for non-performance. ADT therefore claims that it should actually receive a refund of $115,664 ($220,664 paid - $105,000 earned). The Court does not agree.

As an initial matter, the Court finds that the contract is not ambiguous and that the intent of the parties can be discerned from the language of the agreement. Based on the plain language of the contract, ADT is not entitled to a refund in this case. The language of the parties' agreement provides that the total contract price was to be $331,000. That amount was to be paid with a retainer of $55,166 and then five equal monthly

---

[6] The Court recognizes that there is older, contrary authority that a court may use extrinsic evidence in determining whether an ambiguity exists. *See Mary Dolan & Assocs., Inc. v. Quain & Ramstad Clinic*, No. C8-93-473, 1993 WL 480184, at *2 n.1 (Minn. Ct. App., Nov. 23, 1993) (citing contrary authority). However, the consensus of more recent Minnesota case law is that an ambiguity is to be determined by reference to the language of the contract. *See, e.g., In re Schomburg v. Garthe*, No. C7-00-1926, 2001 WL 537056, at *3 (Minn. Ct. App., May 22, 2001) ("caselaw has repeatedly emphasized that ambiguity must be based on the language of the contract alone").

installments of $55,166. While the total contract price of $331,000 was calculated by multiplying the number of positions to be filled by the cost per hire, that "formula" was not incorporated into the payment terms of the contract. It was provided to justify the total contract price. The payment terms were explicitly set forth in the agreement and no refund was contemplated. The contract language makes clear that ADT was to make monthly installment payments for the duration of the contract. Payments were not based on a monthly "per hire" fee nor was Advantage to apply the monthly payments to the "per hire" costs. This understanding is confirmed by the conduct of ADT before it canceled the agreement. At no time during the contract period did ADT contend that it was not required to pay the monthly fee or that it should pay a discounted fee based on the number hires that had been made during a given month. The clear intent of the parties was that monthly payments of $56,166 were to be made, regardless of the number of hires. *Metro. Sports Facilities Comm'n.*, 470 N.W.2d at 122-23 ("court's role in interpreting a contract is to ascertain and give effect to the intention of the parties"). ADT is therefore not entitled to a refund.

Moreover, the cancellation fee included by the parties in the contract must be given effect. The parties explicitly agreed that in the event ADT chose to cancel the project for any reason other than non-performance, a cancellation fee of $750 would be charged for every position that remained unfilled. Termination clauses such as this one

are permitted by Minnesota law.[7] *Kauffman Stewart, Inc. v. Weinbrenner Shoe Co.*, 589 N.W.2d 499, 502 (Minn. Ct. App. 1999).

The plain language of the provision explains that the fee is inapplicable when the contract is canceled based on documented non-performance by ADT. The post-hoc argument made by ADT that termination was made because of non-performance is not persuasive. ADT is unable to point the Court to any **documented** examples of non-performance that would justify canceling the contract.[8] While the number of hires had not yet approached the contract requirement of 187 as of the end of September 1999, Advantage had recently reaffirmed its willingness and intent to devote additional resources to the project at no additional cost to ADT, to ensure that the contract deadlines were met. Because ADT cannot show sufficient documentation of non-performance to warrant canceling the agreement as is required by the contract, the cancellation fee of $750 per unfilled position applies.

However, the Court does not believe that the cancellation fee was intended to be paid **in addition to** the full contract price. Instead, the more reasonable interpretation of the agreement is that ADT was expected to continue making monthly installment payments until the contract was either completed or it was cancelled. Here, ADT made the initial retainer payment and three installment payments. The contract was then

[7] The parties do not dispute that Minnesota law is applicable.

[8] In support of its contention that the contract was canceled for non-performance, ADT relies heavily on the fact that Braun admitted in deposition testimony that Advantage had made some mistakes during the project and that some of ADT's general managers were not satisfied with Advantage's performance. However, there is little, if any, contemporaneous documentation that demonstrates dissatisfaction or non-performance on the part of ADT.

cancelled. Advantage is entitled to retain the fees it collected up to the point when ADT cancelled the contract. In addition, Advantage is entitled to the cancellation fee of $750 for the 127 positions that were not filled, a total of $95,250.

This interpretation of the contract is supported by the language of the cancellation provision. The fact that the parties contemplated cancellation of the contract for reasons other than non-performance demonstrates that the cancellation fee was intended to take the place of remaining monthly installment payments. The use of the word "cancel" in the agreement itself implies that the contract could be terminated and remaining installment payments halted. If the parties intended the cancellation fee to be paid in addition to the full contract price, that should have been made clear in the contract, something that would not have been difficult to do. This interpretation of the contract reconciles all the provisions of the contract and gives effect to the intentions of the parties as manifested in the language of the agreement. *Chergosky*, 463 N.W.2d at 525 (explaining that court is to "construe contract as a whole and attempt to harmonize all clauses").

Summary judgment is therefore granted in favor of Advantage on its contract claims and ADT is to pay Advantage an additional $95,250.

## III. Indemnity Claim

ADT also claims that it is entitled to indemnification from Advantage for a conciliation court judgment that it was forced to pay to Kenneth Kjer, a subcontractor of Advantage, in the amount of $2,430. ADT alleges that Advantage was contractually

obligated to pay Kjer for the services he performed out of the money that Advantage received from ADT. Advantage failed to pay Kjer and Kjer received a judgment against ADT in conciliation court when Advantage did not appear. ADT now claims that it is entitled to indemnification in the amount of the judgment.

Indemnification may arise out of a contract relationship. *Zontelli & Sons, Inc. v. City of Naswauk*, 373 N.W.2d 744, 755 (Minn. 1985). The application of indemnity depends upon the particular facts of the case. *Id.* A party is entitled to be indemnified for its liability where the one seeking indemnity has incurred liability because of a breach of duty owed by the one sought to be charged. *Id.*

In this case, ADT breached its contract with Advantage. ADT should have anticipated that by canceling the contract it could be found liable for payment to third parties that Advantage had hired to perform services on the ADT project. Here, judgment was entered in conciliation court against ADT and not against Advantage. Based on the facts of this case, the Court will not require Advantage to indemnify ADT. Summary judgment is therefore granted in favor of Advantage on this claim.

## ORDER

Based upon the foregoing, the submissions of the parties, the arguments of counsel and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff Advantage Consulting, Inc.'s motion for summary judgment [Docket No. 34] is **GRANTED**.

2. Defendant ADT Security Services, Inc.'s motion for summary judgment [Docket No. 28] is **DENIED**.

3. Counts I, II, and III of the Amended Counterclaim [Docket No. 11] are dismissed with prejudice.

4. The Clerk of Court is instructed to enter judgment in favor of plaintiff in the amount of $95,250.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: Sept 6, 2001
at Minneapolis, Minnesota.

John R. Tunheim

JOHN R. TUNHEIM
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

**DATE MAILED TO COUNSEL/PRO SE PARTIES:** September 7, 2001

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

> ***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

Forms/8thcircuitprehearingconf.wpd

**Please forward this announcement to the recipient of this fax.**

---

# The United States District Court, District of Minnesota announces two new programs!

**Expedited Trials** –The Court will begin offering parties an opportunity to participate in a program called Expedited Trials beginning July 2, 2001. This voluntary program offers an alternative to traditional case processing by allowing for a shorter time period from filing to disposition. Discovery and motion practice will be sharply limited as a means to reduce time and expense. Procedural rules are on the Court's website at www.mnd.uscourts.gov. If you would like additional information about the Expedited Trials Program, contact one of our clerk's offices at the phone numbers listed below.

**Courtroom Technology – Phase II** – In June 2001, the District of Minnesota began upgrading, installing, and enhancing the technology available to counsel in the courtroom. The project will continue through early fall and will ultimately upgrade all Article III Judge courtrooms in St. Paul and Minneapolis. To assist counsel with this transition, the District Court is offering a hands-on class, worth one hour of CLE credit at both courthouses. Classes will be held over the lunch hour. Course registration can be done by visiting www.mnd.uscourts.gov or by calling Kristine at 612-664-5125.

## For additional information on either program please visit our website at www.mnd.uscourts.gov.

---

700 Federal Building
316 North Robert Street
St. Paul, MN 55101
(651) 848-1100

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5000

417 U. S. Courthouse
515 West First Street
Duluth, MN 55802
(218) 529-3500